**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Samir Jakupovic, | ) | Case No. 23 B 15263 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| David Leibowitz, Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 24 A 244 |
| | ) | |
| v. | ) | |
| | ) | Hon. Michael B. Slade |
| Samir Jakupovic, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

David Leibowitz, Chapter 7 Trustee (the "Trustee"), brought a two-count Adversary

Complaint objecting to Samir Jakupovic's discharge.  The case went to trial on August 14, 2025.[1]

Two witnesses testified and documents were admitted into evidence.  Both parties then submitted

proposed findings of fact and conclusions of law.  (Docket Nos. 44, 46)

For the reasons stated below, the Trustee did not prove his case and I find in favor of the

Debtor.  The Debtor shall not be denied a discharge on the grounds claimed by the Trustee in this

Adversary Complaint.[2]  My findings of fact and conclusions of law follow.

---

[1]   The Trial Transcript is available at Docket No. 43 and will be cited as ("Tr. __").  The Trustee's Exhibits 1–14 (Dkt. No. 32) are cited as "TX__."  The Debtor's Exhibits 1–21 (Dkt. No. 51) are cited as "DX__."

[2]   The Debtor's ex-wife, Zilha Jakupovic ("Zilha"), filed a separate adversary proceeding seeking to deny the Debtor a discharge as to the claims brought by her (which stem from a divorce settlement).  (*See* Adv. Pro. No. 24-102, United States Bankruptcy Court, Northern District of Illinois)  The parties settled that dispute and I entered an order that such obligations are not discharged.  (*See id.* at Dkt. No. 45)

**PROCEDURAL HISTORY**

The Debtor filed this Chapter 7 case on November 13, 2023 (the "Petition Date"). (Bankr. Case No. 23-15263, Dkt. No. 1)  After completing his investigation, on August 19, 2024, the Trustee filed this Adversary Complaint against the Debtor.  (Dkt. No. 1, Compl.)  The Trustee's Complaint sought to deny the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2) and 727(c)(1) for two separate reasons.  (Dkt. No. 1, Adversary Cover Sheet)

Count I of the Adversary Complaint addresses a condominium at 757 N. Orleans, Unit 2112 (the "Condo").  The Debtor bought the Condo for $447,000 (Compl. ¶ 10) and, on July 7, 2023—about four months before the Petition Date—sold it to Lalla Dafa for $375,000 (*id.* ¶ 11). The Trustee alleges that the fair market value of the Condo at the time of sale exceeded $500,000.  (*Id.* ¶¶ 12–13)  The Trustee also alleges that Ms. Dafa did not move into the Condo at the time of the purchase and that the Debtor continued to live there (along with his significant other) rent-free. (*Id.* ¶¶ 15–18)  The Trustee contends this series of events demonstrate that the Debtor sold the Condo with the intent to hinder, delay, and defraud his creditors and, therefore, the Debtor should see his discharge denied. (*Id.* ¶¶ 19–21)

Count II of the Adversary Complaint addresses S&L Intermodal, Inc. ("S&L").  S&L was owned by the Debtor and was allegedly transferred to his brother less than a year before the Petition Date "for no consideration whatsoever." (*Id.* ¶ 22)  The Trustee's Complaint alleges that S&L had, in addition to being an operating company with gross sales of nearly $2 million for the last year for which such information was available, ownership of "several valuable vehicles" including a Mercedes and a Maserati.  (*Id.* ¶¶ 23–26)  The Trustee alleges that S&L's value was "substantially in excess of zero" and that the Debtor had transferred it to his brother in a further effort to hinder, delay, and defraud creditors. (*Id.* ¶¶ 24, 27)

2

If these allegations were proven the Debtor would almost certainly be denied a discharge. So I set the case for trial. The Trustee disclosed four witnesses: the Debtor, Sanel Jakupovic (the Debtor's brother), and John Pogacnik and Michael Isally (two appraisers). (Dkt. No. 34) The Debtor disclosed himself, his brother, Zilha (his ex-wife), Anthony Peraica (his ex-lawyer), Ana Sandoval (his ex-real estate broker), and Lalla Dafa (the Condo buyer). (Dkt. No. 29)

Ultimately, however, only two witnesses were called to testify live: the Debtor and Mr. Peraica. The depositions of Sanel Jakupovic (TX6), Mr. Pogacnik (TX13), and Theodore Heichert (another appraiser) (TX14) were admitted into evidence. (Tr. 6:24–7:2) Ms. Dafa, Zilha, Ms. Sandoval, and Mr. Isally were not called.

## JURISDICTION

I have subject matter jurisdiction under 28 U.S.C. § 1334(b) and the District Court's Internal Operating Procedure 15(a). As an objection to discharge, this is a core proceeding. 28 U.S.C. § 157(b)(2)(J). I also have constitutional authority to enter a final order determining the questions presented here but, even if I did not, the parties have consented to my doing so. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 686 (2015).

## FINDINGS OF FACT[3]

The Debtor and his wife, Zilha, were married in 1996 (DX11 ¶ 3). In 2019, Zilha filed a petition for dissolution of marriage with the Circuit Court of Cook County, County Department, Domestic Relations Division (the "Divorce Court"). The Divorce Court entered a Judgment for Dissolution of Marriage on August 18, 2022 (DX11, the "Divorce Judgment"), which incorporated, and compelled compliance with, a Marital Settlement Agreement (DX12).

---

[3] As described in Footnote 8 below, the Trustee conceded Count II after trial. Accordingly, I will not make formal findings of fact and conclusions of law as to Count II except for accepting the Trustee's concession. These findings are only those necessary for me to resolve Count I.

The Marital Settlement Agreement contained several terms germane to the allegations made by the Trustee here.  Perhaps most important was the Debtor's promise to make payments to his wife over time totaling $1.04 million.  (DX12 § 5.7)  Under the terms of the agreement, the Debtor was obligated to pay, among other things, $55,800 on the date of entry of the Divorce Judgment, another $49,200 within six months (by February 18, 2023), another $250,000 within two years (by August 18, 2024), and additional monthly payments of $5,000 for nine years.  (*Id.*; *see also* Tr. 116:24–117:9, 119:11–120:5)

Another part of the Marital Settlement Agreement key to the dispute before me is the parties' property settlement.  (DX12 § V)  Among other assets, at the time of the divorce they arguably had interests in five pieces of real estate, which were addressed as follows:

- The marital home at 8110 W. Balmoral was sold, and the Debtor and his wife split the proceeds.  (*See id.* § 5.2(a); Tr. 108:9–109:19).  To sell the home, the couple hired Ana Sandoval as their real estate broker, and she successfully arranged a buyer quickly, for the price they wanted, while the couple separated.  (*Id.*)

- A home at 6440 Foster was awarded to the Debtor.  (DX12 § 5.2(b)).  That home was also sold (more than a year before the Petition Date) through the services of Ms. Sandoval.  (Tr. 110:2-112:11)  It had been a poor investment for the Debtor, was "getting old," had a "problem with the roof," and was "not in that great area." (*Id.* at 111:8-21)  The Debtor ultimately lost money on the deal but was happy with Ms. Sandoval's work helping him sell the property under challenging circumstances.  (*Id.* at 111:22–112:11)

- Property in Bosnia next to the Debtor's parents' residence that was effectively a ground lease (and not saleable) because the Debtor's father refused to sell or permit the use of the underlying land.  (*Id.* at 112:12–114:6; *see* DX12 § 5.2(d))

- Property at 420 Talcott where the Debtor merely co-signed for a mortgage to help a friend; he had no ownership interest in the property, and the agreement merely confirmed Zilha's lack of an interest, too.  (DX12 § 5.2(e); Tr. 114:7–115:22)

- The Condo, which was acquired by the couple during their marriage, and was awarded to the Debtor free and clear. (DX12 § 5.2(c))

Again, each of these provisions was incorporated into the Divorce Judgment, which was entered by the Divorce Court on August 18, 2022.  (DX11, p. 3 ¶ (B))

4

Complying with divorce court orders is serious business, and the Debtor knew precisely how serious before the Divorce Judgment was even entered. In fact, as referenced in the Marital Settlement Agreement, the Debtor had previously been held in contempt by the Divorce Court for failing to make a court-required payment (which he claimed he was unable to make) and was incarcerated as a result. (Tr. 117:11–119:9) He stayed "three or four days" in jail, at a holding facility at 26th and California in Chicago. (*Id.*) His testimony that this experience was "terrible" and "so bad"—he had never previously had a problem with the law—was credible. (Tr. 119:2-5)

Other testimony offered at trial corroborated that the Debtor had strong reason to strictly comply with the Divorce Judgment (and the Marital Settlement Agreement within it). Anthony Peraica is an experienced lawyer who represented the Debtor before the Petition Date in a variety of business and personal matters, including his divorce. (Tr. 67–68) He testified that it is "normal" for a spouse who fails to pay a support obligation to be jailed if the state court believes that he or she has the money and is unwilling (as opposed to unable) to pay. (Tr. 75:14–76:18) As Mr. Peraica described, a court will typically issue a rule to show cause, and absent prompt compliance will "instruct the sheriff in the courtroom to take him into custody," which is what happened to the Debtor in 2021, prior to entry of the Divorce Judgment. (Tr. 76:1-11)

About a month after the Divorce Judgment was entered, on September 19, 2022, Zilha filed a "Petition for Rule to Show Cause, For a Finding of Indirect Civil Contempt and for Other Relief" in the Divorce Court. (DX13) Zilha argued that the Debtor owed $13,048 and had not paid in a "willful and contumacious disregard" of the Divorce Judgment. (*Id.* ¶ 4) Zilha asked the court to sanction the Debtor for his failure to pay, including "a period of incarceration of up to six (6) months in duration with the Cook County Department of Corrections." (*Id.* at 207 ¶ (D)) The Debtor did not have the $13,000 that he owed; he could not pay. (Tr. 120:8-17)

5

On December 12, 2022, Zilha filed a "Second Petition for Rule to Show Cause, For a Finding of Indirect Civil Contempt and for Other Relief." (DX14) Zilha argued that the Debtor had shorted her $2,000 from her monthly maintenance payment and, again, asked the court to hold the Debtor in contempt of court for his "willful and contumacious failure to comply" with the Divorce Judgment. (*Id.* ¶¶ 3, 5) Zilha again argued for various sanctions to be imposed on the Debtor, including a period of incarceration of up to six months. (*Id.*, p. 3 ¶ D)

On February 9, 2023, the Divorce Court entered an Order on the pending Rules to Show Cause. (DX15) The Debtor was ordered to appear for status on April 10, 2023,[4] and was advised that "a prima facie case of indirect civil contempt has been shown." (DX15)

On February 27, 2023, Zilha filed a "Third Petition for Rule to Show Cause, For a Finding of Indirect Civil Contempt and for Other Relief." (DX16) Zilha argued that the Debtor had failed to pay the $49,200 installment owed on February 18, 2023, and that his failure to pay was a "willful and contumacious failure to comply" with the Judgment. (*Id.* ¶¶ 2, 3) Again, Zilha sought various sanctions to be imposed on the Debtor, including a period of incarceration of up to six months. (*Id.* at p. 2, ¶ C; *see also* Tr. 123:17–124:4)

The Debtor did not have the money that he was obligated to pay his ex-wife at the time. (Tr. 124) He had closed his businesses (*id.*) and "all the assets" had been "returned to the lenders, banks, to everyone" (Tr. 125:2-6). He filed a statement advising the state court that "due to the lack of revenue" he had closed his businesses and had far less income than he did at the time of the divorce settlement. (Tr. 125:15–126:4; *see also* DX18 ¶ 2). And he also filed a motion to modify his obligations under the Judgment and underlying Marital Settlement Agreement, but that motion was stricken by the Divorce Court. (DX17 ¶ 1)

---

4   The Divorce Court's Order (DX15) says April 10, 2022, but that's a typo. The Debtor was ordered to show cause on or before April 10, 2023 (Tr. 123:6-13).

6

At a status hearing on the Rules to Show Cause on May 5, 2023, the Divorce Court held the Debtor in contempt and "ordered [him] committed to the Cook County Jail, there to remain until" he "purged" his contempt by "[p]aying the total amount of $62,548.00 to Zilha Jakupovic." (DX19, at p. 287)  The Debtor's commitment to jail was stayed until June 8, 2023 (Tr. 126:23–127:3), but the Debtor was ordered to surrender his passport.  (*Id.*)

The Debtor testified that his reaction to the very real threat of going back to jail was that he needed to promptly sell the Condo to generate funds needed to pay his wife what he owed. He testified that "I cannot go back to the Cook County [jail]"—which was a credible reaction. (Tr. 127:7-10)  He testified that he approached Ms. Sandoval—who, as described above, had successfully sold other properties for him—and told her that he had to list the Condo for sale because "I have a lot problem my divorce court, and I need the money.  I don't get money, God knows what's going to happen with me." (*Id.* at 127:11-17)  Ms. Sandoval located a buyer, Ms. Dafa, but she was only willing to pay $375,000. (*Id.* at 128:14-18, 129:1-4)  The Debtor (who had listed the property for $425,000 on the advice of Ms. Sandoval given the need for a quick sale) tried to bargain for more but ultimately agreed to sell.  (Tr. 128:18–129:10; *see also* DX9)

The bottom line is that I credit the Debtor's story that he sold the Condo to generate liquidity quickly and avoid jail, not to hinder, delay, or defraud creditors.  I thought the Debtor credibly testified on that issue.

The Trustee focuses much of his argument on the claim that the Debtor sold the Condo for well below market value.  Indeed, the Debtor admitted in his answer that "the condominium and parking space's fair market value was over $500,000" and that the sale price "was more than $130,000 less than the fair market value of the condominium as of the date of sale." (Dkt. No. 10, Defendant's Answer to Complaint ¶¶ 12–13)  And the Trustee substantiated this complaint

allegation with two appraisals (TX2 and TX3) identifying comparable sales in the same building

in the ballpark of the price stated by the Trustee.  Two appraisers, moreover, were deposed.  One

testified (among other things) that a sale of this Condo for substantially less than $400,000 would

be for "substantially less than fair market value" and that he "would try to find out if there were

any extenuating circumstances why that sale happened."  (TX14, p. 19)  The other testified

similarly that a range of fair market value would be between $491,000 and $505,000 (with a

midpoint of approximately $500,000) (TX13, p. 16) and that a sale at less than $400,000 would

indicate in his view that "either it didn't get exposed to the market or there—there was some

relationship going on that you would accept less money than what it was worth" (*id.* at p. 19).[5]

The evidence establishes that the Condo was sold on the cheap.  But it was a fire sale.

The Debtor had only 34 days to purge the contempt order to avoid returning to jail—a period that

required a truncated sale timeline.  That explains the sale price.  In addition to the Debtor's

testimony on the subject, the inferences I draw from other evidence adduced at trial buttress my

conclusion that the Debtor sold the Condo for less than market value to save himself from jail

rather than to evade, avoid, hinder, or defraud any creditors:

---

[5]  After trial, the Debtor filed a motion seeking to amend his answer based on testimony that he believed the Condo was worth less than $500,000 because it was in "bad condition" at the time.  (Dkt. No. 47; *see also* Tr. 134:19–136:1)  That motion is denied.  An answer is a judicial admission that "may not be controverted at trial or on appeal" and "is not evidence at all but rather ha[s] the effect of withdrawing a fact from contention." *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995); *see also Archer Daniels Midland Co., v. Soymet 101, LLC*, No. 14-cv-2181, 2016 WL 6157944, at *3 (C.D. Ill. July 21, 2016) ("[A]n admission in an answer is conclusive").  I probably would have sustained an objection to the Debtor's testimony at trial given that it sought to defy his answer—to re-argue a fact the Seventh Circuit has advised was "withdrawn from contention."  Moving to change an admission in an answer post-trial is not helpful; to be credible, it needed to happen far earlier.  The Debtor cites Rule 15(b)(1), but that rule does not apply.  Rule 15(b)(1) (applicable here per Fed. R. Bankr. 7015) by its terms permits amendment of a pleading where a party objects to trial evidence as outside the issues raised by the pleadings.  That's not what happened here.  As the Trustee notes, whether the Condo was sold for below market value was always within the pleadings and an important point for me to consider.  And in any event, I did not find the Debtor's testimony on the issue of market value compelling and I would have come to the same conclusion even if I allowed him to amend his answer.  It's clear that the Condo was sold below market value.  That isn't particularly surprising, though, given the Debtor's core story which I *do* credit:  that he had to sell the property quickly (regardless of price) given his circumstances at the time.  Fire sales where (for example) a property is not fully "exposed to the market" (TX13 at p. 19) often yield prices below market value.

First, the Debtor was selling his residence without a particularly great place to go. Instead, after he sold the Condo, the Debtor moved into his brother's basement because he "didn't have money" and his "credit was ruined"; he "didn't have no choice." (Tr. 106:3-21) The Trustee alleged in his complaint that the transaction was fishy because the Debtor continued living in the Condo with a companion, Mina Pavlovic, after the sale closed (Compl. ¶¶ 15–18). But there was no evidence at trial supporting that allegation. And the Trustee offered no evidence contradicting the Debtor's testimony that he moved into his brother's basement.

Second, the Trustee offers no credible reason that the Debtor would sell the property *to Ms. Dafa*, deliberately gifting *her* a valuable asset on the cheap. Why would he prefer her over his creditors? The Debtor testified that he had no contact with Ms. Dafa before or after the sale and doesn't otherwise know her. (Tr. 40:7-13, 131:10-16) The Trustee introduced no evidence of any contact between the Debtor and Ms. Dafa before or after the transaction—the fact that Ms. Dafa later did business with the Debtor's brother does little to suggest anything amiss.[6] While it is possible this was a collusive sale (both the Trustee and Zilha separately alleged that it was), the Trustee didn't prove that. The evidence does not establish an insider transaction to prefer a friend on the eve of bankruptcy, but rather a fire sale to generate cash to ensure the Debtor's liberty. Absent evidence that the Debtor continued to live in the Condo, had a relationship with Ms. Dafa such that he would benefit from her ownership of the Condo, or would share in any profit if Ms. Dafa re-sold it in the near term (of which there was none), it would make no sense for the Debtor to sell the Condo on the cheap with the intent of harming creditors. It appears the

---

[6] While the Debtor appeared to know something of Ms. Dafa's work history (Tr. 40:20–41:10), that knowledge could have been obtained in various ways, including through his participation in the defense of this Adversary Proceeding, and no inferences can reasonably be drawn from that knowledge—particularly as neither party called Ms. Dafa to testify.

Debtor lost value in the transaction, rather than moved value around in the shell game that is a hallmark of § 727(a)(2)(A)-worthy transfers.[7]

Third, the fire sale of the Condo for a price materially below market value did not produce a windfall for the Debtor. Wells Fargo had a first lien on the property and received the first $280,174.39. (Tr. 134:10-13:; *see* DX10 at p. 175) The Debtor also had to pay two years of taxes totaling over $12,000 from the proceeds. (DX10 at p. 174) Other commissions and fees cost the Debtor approximately $8,000. (*Id.* at p. 175) The Debtor received $74,405.56 total, barely enough to pay what the Contempt Order required him to pay to avoid jail time.

The Trustee's response is to argue that the Debtor had an alternative way to generate cash: he could have repatriated funds that his businesses had sent to Bosnia in 2019 and 2020 and were in accounts in his mother's name that he had access to. The Trustee points out that in July 2024, while the Debtor was in bankruptcy, the Debtor did in fact withdraw 1.6 million Bosnian marks (worth $872,000), from Bosnian banks. (Tr. 49:9–51:12) If he was so desperate to avoid jail, the Trustee posits, why didn't he just do the same thing in 2023?

The Trustee makes a fair point that, while the Debtor was in a challenging situation, he may have had other options to avoid jail. So I posed that question directly to the Debtor at trial. (Tr. 149:19–151:11) I asked him: "Why did you sell the condo to get your money to pay what

---

[7] The Trustee separately brought Adversary Proceeding No. 24-121, *Leibowitz v. Dafa*, against Ms. Dafa, arguing that the transaction was a fraudulent transfer. As part of that Adversary Proceeding, the Trustee contended that Ms. Dafa was the Debtor's girlfriend, making her an "insider" under the Bankruptcy Code. (*See id.*, Dkt. No. 1 (Compl.) ¶ 14) Ms. Dafa's answer admitted many things about the transaction, but denied having a romantic relationship with the Debtor. (*See id.*, Dkt. No. 6 (Answer) ¶ 14) And the Trustee ultimately settled his fraudulent transfer suit against Ms. Dafa, with her agreeing to pay the estate a total of $40,000, over time. (*See* Bankr. Case No. 23-15263, Dkt. No. 64 (Trustee's Motion to approve Settlement) and Exhibit A thereto (Affidavit of Trustee David Lebowitz)) That separate Adversary Proceeding and the Trustee's settlement motion resolving it are consistent with my takeaway from the trial evidence in this Adversary Proceeding—the sale of the Condo was for less than market value, and the Debtor did not receive reasonably equivalent value, but it was a true third-party sale from which the Debtor did not materially benefit; instead, his counterparty took advantage of the Debtor's challenging situation to acquire an asset for a bargain-basement price.

you owed to your ex-wife rather than [use] the money in those [Bosnian] accounts." (Tr. 149:24–150:1)  In response, he described, in a calm demeanor I found credible, that the money had been sent by his businesses (not him) to Bosnia in 2019 and 2020, for family members' and business expenses in Bosnia, and it was owed to creditors in Bosnia and was being used for those purposes. (Tr. 150:2–151:11)  I found that explanation, while not completely exculpatory, both honest and sufficient.  Particularly where the Trustee offered no evidence to the contrary.

In any event, even assuming the Debtor could have raided these Bosnian accounts for funds to solve his urgent problem of avoiding jail in July 2023, that doesn't mean his decision to sell the Condo instead to solve the same problem was done with the intent of hindering, delaying, or defrauding creditors.  For the reasons described above, I don't think the Debtor had the intent of hindering, delaying, or defrauding creditors when he sold the Condo and find that his intent when doing so was to avoid a prompt return to the Cook County jail.

## CONCLUSIONS OF LAW

The chapter 7 discharge is "the heart of the fresh start provisions of the bankruptcy law." *Rosen v. Bezner*, 996 F.2d 1527, 1531 (7th Cir. 1993) (*quoting* H.R. Rep. No. 595, 95th Cong., 1st Sess. 384 (1977)).  It allows debtors to be freed from "the burdens of personal liability for [most] unsecured prepetition debts." *Canning v. Beneficial Maine, Inc.* (*In re Canning*), 706 F.3d 64, 69 (1st Cir. 2013).  But getting a discharge is not a right.  It is a privilege reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

"Section 727(a) enforces [the] reservation . . . by list[ing] 12 grounds for denying a discharge." *In re Kempff*, 847 F.3d 444, 447 (7th Cir. 2017).  But denial of discharge under any of these exceptions "is a blunt remedy for actions that hinder the entire bankruptcy process." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 364 (2016).  It is "an extreme step" that should "not

11

be taken lightly." *Rosen*, 996 F.2d at 1531.  The Seventh Circuit has made clear that each of the discharge exceptions should "be construed strictly against the [plaintiff] and liberally in favor of the debtor."  *In re Juzwiak,* 89 F.3d 424, 427 (7th Cir.1996).  This discharge-specific holding, moreover, is consistent with the Seventh Circuit's more general direction that I construe the Bankruptcy Code "liberally in favor of the debtor and strictly against the creditor."  *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002) (citing cases).

The Trustee's complaint asserts one exception to discharge in 11 U.S.C. § 727(a)(2)(A) based on his purportedly fraudulent pre-petition transfer of the Condo and his ownership interest in S&L.[8]  Pursuant to that section, the court will grant a discharge unless:

> the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A).  To succeed, the Trustee must prove by a preponderance of evidence that: (1) the debtor transferred property; (2) belonging to the debtor; (3) within one year of the petition; (4) with the intent to hinder, delay, or defraud a creditor.  *See, e.g.*, *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd sub nom. Kontrick v. Ryan*, 540 U.S. 443 (2004); *McWilliams*, 284 F.3d at 790; Fed. R. Bankr. P. 4005.

The first three elements are typically easily proved.  The requisite intent not so much. The issue of a debtor's intent is a question of fact.  *See, e.g.*, *In re Smiley*, 864 F.2d 562, 566 (7th Cir. 1989).  But "[b]ecause direct evidence of a debtor's intent usually will be unavailable, it may be inferred from the circumstances surrounding his objectionable conduct."  *In re Krehl*, 86 F.3d

---

[8]   The Trustee now concedes that the transfer of the interest in S&L occurred more than one year before the Petition Date (Dkt. No. 48 at ¶ 26), putting it outside the scope of section 727(a)(2)(A) as a ground for denial of discharge.  This is consistent with Mr. Peraica's testimony (*see* Tr. 71:5–72:1) and the documents effectuating the transfer (*see* DX3).  So even if the transfer of that interest was done with the intent to hinder, delay, or defraud creditors (for the record, I don't believe that was proven either), it would not be grounds for denying a discharge (as the Trustee also concedes).

737, 743 (7th Cir. 1996).  I am required to consider, and do consider, the Debtor's entire course

of conduct.  *See, e.g.*, *Smiley*, 864 F.2d at 567–68; *McWilliams*, 284 F.3d at 791.  And I look for

factors that "if proven, indicate actual fraud," including:

> (1) the inadequacy of consideration; (2) the family, friendship or close associate
> relationship between the parties; (3) the retention of possession, benefit or use of
> the property in question; (4) the financial condition of the party sought to be charged
> both before and after the transaction in question; (5) the existence or cumulative
> effect of the pattern or series of transactions or course of conduct after the incurring
> of debt, onset of financial difficulties, or pendency or threat of suits by creditors;
> and (6) the general chronology of the events and transactions under inquiry.

*McWilliams*, 284 F.3d at 791.

As the Trustee describes, the Seventh Circuit has held that if "one of more of these

factors are met," a presumption of fraudulent intent is created, "establishing [the trustee's] prima

facie case and shifting . . . the burden to the debtor of demonstrating he lacked fraudulent intent."

*Id.* (citation omitted); *see also Johnson v. Miles (In re Miles)*, 652 B.R. 320, 338 (Bankr. N.D. Ill.

2023); *Nelson v. Zarling (In re Zarling)*, 628 B.R. 624, 633 (Bankr. N.D. Ill. 2021).

Here, the trustee proved that the Debtor transferred the Condo on July 7, 2023, a date

within one year of the Petition Date.  The Trustee also did establish at least one of the "badges"

of fraud described in *McWilliams,* although the evidence was mixed:  while the Condo was sold

for a price that was under market value, it was sold to a true third party, the Debtor did not retain

any benefit or use of the Condo, and he did not benefit much from the transaction since most of

the net consideration was used to purge his contempt and avoid jail.  While the Trustee offered

evidence that the Debtor had sent additional funds to accounts in Bosnia several years earlier,

those transactions were at a different time, were made from the Debtor's business (not his

personal accounts), and were not at all connected to the sale of the Condo—which was fully

disclosed in the Debtor's bankruptcy filing and not concealed from anyone.

Precedent suggests that where (as here) a debtor sold an asset for less than market value within the one-year lookback period provided by 11 U.S.C. § 727(a)(2)(A), the debtor will need a good explanation for why he or she did that to avoid the denial of discharge.[9] But here, the Debtor had a good explanation, and the evidence offered to substantiate it demonstrates that the Debtor did not sell the Condo with the intent to hinder, delay, or defraud his creditors.[10]

---

[9] *In re Snyder*, 152 F.3d 596, 602 (7th Cir. 1998) (debtors denied discharge when they had no good explanation for transferring "property of the estate to two corporations nominally owned and managed by members of their family by charging those corporations below-market rates for the rental of their lands and little or nothing for the use of their farming equipment"); *Smiley*, 864 F.2d at 563 (debtor denied discharge when he had no good explanation for transactions in "preparation" for a home purchase); *Ryan v. Kontrick*, No. 00 CV 5736, 2001 WL 630676, at *7 (N.D. Ill. May 31, 2001), (affirming denial of discharge where debtor had no non-fraudulent explanation for his conduct during lookback period) (debtor "points to no evidence, sworn affidavits, or anything else providing an alternative explanation to why he removed his name from the checking account and continued to deposit his salary into an account that he did not have access to. Instead of paying his creditors, [debtor] purposely put his money where Ryan and his other creditors could not reach it—and he testified to that under oath"); *Zarling*, 628 B.R. at 635 (denying discharge where "Zarling's explanations for the transfer do not satisfy *McWilliams*' requirement that he demonstrate a lack of fraudulent intent. He first admitted in his Answer that he did not have a reason for the transfer. Then, when asked at trial why he did not disclose the workers' compensation claim in his bankruptcy papers, Zarling did not know. Finally, he pivoted when pressed to establish a justification for his actions and to negate the presumption that he acted with intent to defraud. Zarling offered reasons that are not consistent with his past behavior and that occurred only when he received a large sum of money while Nelson pursued her post-judgment enforcement actions."); *Rogers v. Boba (In re Boba)*, 280 B.R. 430, 435 (Bankr. N.D. Ill. 2002) (denying discharge where debtor's explanations for transfers within the lookback period "are so implausible as to be unreasonable under the circumstances of the case"); *WiscTex, LLC v. Galesky (In re Galesky)*, 648 B.R. 643, 666 (Bankr. E.D. Wis. 2022) (rejecting creditor's argument to deny discharge where debtor offered "credible testimony" explaining the reasons for selling an asset within the 1-year lookback period other than efforts to delay, hinder, or defraud creditors); *Divelbiss v. Maida (In re Maida)*, No. 98 B 40900, 2000 WL 777875, at *3 (Bankr. N.D. Ill. June 15, 2000) (rejecting § 727(a)(2) objection to discharge where debtor "adequately explained" the transactions in a non-fraudulent way).

[10] The facts here are very different from *McWilliams*. There, "[t]he McWilliamses did transfer the properties for $1.00 and love to their grandchildren, retained possession of the deeds, and transferred the properties after they had been notified that the Village demolished the building and would seek to recoup the costs from them. This circumstantial evidence demonstrates the McWilliamses transferred the properties to either conceal or prevent the Village from obtaining them to satisfy their debts." *McWilliams*, 284 F.3d at 791. Not so here. And the facts here are also very different from *PNC Bank v. Leongas (In re Leongas)*, 628 B.R. 71 (Bankr. N.D. Ill. 2021), a case referenced by the Trustee during his opening statement. There, the Debtor concealed the very transaction that the creditor argued triggered 727(a)(2), and all of the badges of fraud described in *McWilliams* were present: "the Debtor's close, personal friend, purchased the Residence, thereby saving it from foreclosure, and, with no apparent benefit to him, allowed the Debtor and his family to continue living in the home so long as [the friend's] mortgage and all of the other expenses related to the Residence were paid either by the Debtor or on his behalf." *Id.* at 97. In addition, "the Debtor's testimony regarding the transfers of the Residence and the payment of his living expenses by the family businesses was inconsistent, dubious, and self-serving," and Judge Baer found that the debtor's testimony and conduct on the witness stand "lacked credibility." *Id.* at 98–99. Here, the facts showed the opposite, and the Debtor's story and testimony was credible.

So while the burden under *McWilliams* shifted to the Debtor to explain his intent in selling the Condo, the Debtor sufficiently rebutted any presumption of fraudulent intent.  I found him credible when he explained his intent in transferring the Condo was to get funds quickly to avoid jail.[11]  Note again that this was not a good transaction for the Debtor.  He lost his residence and had to move into his brother's basement; he did not retain material cash or access to the Condo's true value; the transaction did not benefit any current family member or known friend; and the transaction was fully disclosed.  This transaction—the only one that the Trustee continues to challenge—does not provide sufficient grounds to deny the Debtor a discharge under 11 U.S.C. § 727(a)(2)(A).

***

For these reasons, a separate judgment will be entered in favor of the Debtor pursuant to Bankruptcy Rule 7058.  The Trustee's objection to discharge is overruled.

Signed:  October 24, 2025          By:  _____

MICHAEL B. SLADE
UNITED STATES BANKRUPTCY JUDGE

---

[11]   A fraud finding is often based on credibility determinations, and I must evaluate whether the debtor's testimony is "contradicted by that of any other witness" and assess the debtor's "demeanor on the stand."  *Krehl*, 86 F.3d at 744.  I consider, among other things, whether the debtor's demeanor "was that of a person who was not being fully forthcoming and truthful."  *Id.* (quotation omitted).  As described above, I believe that the Debtor here was truthful and forthcoming on the issues material to the result here, and I found his testimony credible.  No other witness contravened his version of events.

15